1   MARC M. SELTZER (54534)
    mseltzer@susmangodfrey.com
2   STEVEN SKLAVER (237612)
    ssklaver@susmangodfrey.com
3   SUSMAN GODFREY L.L.P.
    1900 Avenue of the Stars, Suite 1400
4   Los Angeles, CA  90067
    Phone:  (310) 789-3100
5
6   SETH ARD (*Pro Hac Vice Application to be filed*)
    sard@susmangodfrey.com
7   SUSMAN GODFREY L.L.P.
    1301 Avenue of the Americas, 32nd Floor
    New York, NY  10019
8   Phone:  (212) 336-8330
9   *Attorneys for Plaintiff*
10
11              **UNITED STATES DISTRICT COURT**
12              **NORTHERN DISTRICT OF CALIFORNIA**
13
14  PROTÉGÉ RESTAURANT PARTNERS LLC,        Case No. 5:20-cv-03674
    on Behalf of Itself and All Others Similarly
15  Situated,                                **CLASS ACTION COMPLAINT FOR
                                             BREACH OF CONTRACT AND
16          Plaintiff,                       DECLARATORY JUDGMENT AND
                                             INJUNCTIVE RELIEF**
17   vs.
                                             **DEMAND FOR JURY TRIAL**
18  SENTINEL        INSURANCE       COMPANY,
    LIMITED, d/b/a THE HARTFORD,
19
20          Defendant.
21
22
23
24
25
26
27
28

Plaintiff Protégé Restaurant Partners, LLC ("Protégé"), individually and on behalf of all other similarly situated entities (collectively, the "Class"), bring this class action against defendant Sentinel Insurance Co., Ltd. d/b/a The Hartford ("Sentinel").

## NATURE OF ACTION

1.      This is a class action for breach of contract and declaratory and injunctive relief arising from Sentinel's refusal to pay COVID-19-related claims as required by its insurance policies it sold to plaintiff and other policyholders.

2.      According to the National Association of Insurance Commissioners' database, Sentinel collects $650 million per year in annual premiums for commercial insurance, including business interruption policies. Insurance companies collected net premiums of $1.22 trillion in 2018, with 51% of that amount collected by property/casualty insurers, according to the Insurance Information Institute.

3.      Plaintiff Protégé owns and operates a Michelin-starred restaurant located in Palo Alto, California. Protégé is an upscale casual restaurant featuring New American cuisine and a comprehensive wine and spirits program. In response to California and Santa Clara County mandates, and COVID-19, Protégé's restaurant has been completely shut down since March 17, 2020, and continues to be closed to this day.  As a result, plaintiff has suffered substantial losses of income.

4.      Protégé purchased an all-risk commercial property insurance policy from Sentinel to indemnify it for business income lost due to the shutdown of its operations. The current policy is in effect from January 20, 2020, through January 20, 2021. Protégé paid $16,936 in annual premiums for the policy for $4 million in coverage under the policy.

5.      Yet, despite plaintiff's claim for payment under the policy to cover these losses to its income, defendant has refused to provide the protection that plaintiff purchased, citing policy exclusions and coverage defenses that do not apply and which that have no merit. While there is a virus exclusion written into the policy, it explicitly does not apply to the special coverage that provides business income protection under which plaintiff seeks coverage. Moreover, plaintiff is not unique. The reasons given by Sentinel to deny coverage are written in terms that appear

designed to deny coverage to all claims under these form contracts, even though the policy it drafted does not contain an applicable exclusion for losses caused by the Closure Orders and COVID-19 (as described more particularly below).

6.      On March 11, 2020, the World Health Organization (WHO) declaring that COVID-19 had become a pandemic. On March 16, 2020, the United States issued new guidelines urging avoidance of gatherings of more than ten people, and states, counties and cities across the nation began announcing widespread business shutdown and stay-at-home orders, including orders issued by the State of California and Santa Clara County. As of the date of filing of this complaint, more than 1.75 million people were confirmed to have been infected with COVID-19 in the United States, with over 104,000 deaths reported nationwide, according to the United States Centers for Disease Control and Prevention ("CDC").

7.      COVID-19 is caused by a novel coronavirus now known as Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2). It is a physical virus that is spread and transmitted through the air and contact with surfaces of property. While the virus reportedly originated in China, the rapid transmission of COVID-19 has resulted in an exponential increase in the number of cases outside of China to about ten times the number of reported cases and deaths in mainland China. (In this complaint, plaintiff refers to both the virus and the resulting diseases as COVID-19.)

8.      The virus easily disseminates among humans through respiratory droplets, which are produced by coughing, sneezing and talking, and through aerosols, which are released during breathing and can also spread through contact with an object or surface containing the virus. Infected aerosols can remain suspended for hours in the air and for days on objects and surfaces, potentially infecting someone who unwittingly touches an infected object or surface and then touches his or her face.

9.      As of April 1, 2020, the United States and every state in the Union has issued emergency declarations relating to COVID-19, and by mid-April 95% of the population of the United States was under one or more state or local directives to, among other things, refrain from close contact with other persons.

10.     The closure orders typically ordered the shut-down of businesses deemed "non-essential" and prohibited in-person services to be provided on their premises. Businesses deemed "essential" have been also heavily impacted by the closure orders. For example, businesses deemed to be essential have had to cease in-person services (such as dining in a restaurant), adjust cleaning protocols, limit hours, install barriers between employees and customers, and supply employees with personal protective equipment. Many of these businesses have been unable to keep employees at work on their premises because of their fear of becoming infected.

11.     Santa Clara County and the State of California have issued business shut down and closure orders, as have cities, counties and states across the country ("Closure Orders"). These Closure Orders have caused the suspension of operations by both non-essential and essential businesses.

12.     The first case of COVID-19 in California was confirmed on January 26, 2020, and the first case in Santa Clara County was confirmed on January 31, 2020. The first confirmed COVID-19 death in Santa Clara County took place on February 6, 2020.  Given that it takes up to fourteen days to develop symptoms after infection, public health experts estimate that the person who died on February 6, 2020, was likely infected in December 2019.  Public Health experts have also opined that it is likely the virus had been circulating undetected in the United States by November 2019. People infected by the virus have likely visited plaintiff's place of business, and insured businesses across the country, and thereby contaminated plaintiff's property with the virus. By March 15, 2020, there was a known risk that surfaces of physical property located in businesses nationwide were potentially infected, and that risk, among others, prompted the Closure Orders, as acknowledged in those orders.

13.     The transmission of COVID-19 and the Closure Orders have adversely impacted plaintiff's business and the businesses of other class members. For example, customers cannot access their place of business due to the Closure Orders or the fear of being infected with COVID-19. Suppliers to businesses have also been adversely impacted by the Closure Orders and COVID-19.

14.     But plaintiff, like other businesses, prudently prepared for an unexpected event like the COVID-19 pandemic. Specifically, plaintiff purchased insurance from defendant, under Policy No. 57 SBA BK2040 SC (the "Policy"), that did not exclude coverage for income loss caused by a virus. (A true and correct copy of the Policy is attached hereto as Exhibit A.)

15.     The Policy contains several forms and endorsements that define the scope of coverage. Upon information and belief, the forms and endorsements used in plaintiff's Policy are materially the same as policies held by the members of the Class.

16.     The Policy provides coverage for:

    a.  Interruption of business caused by an order from a civil authority ("Civil Authority" coverage) (*id.* at 40);

    b.  Business income losses sustained due to the necessary suspension of operations ("Business Income" coverage) (*id.* at 39);

    c.  Expenses incurred to minimize the suspension of business ("Extra Expense" coverage) (*id.* at 39);

17.     In addition, the Policy requires plaintiff to "[t]ake all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss," which in this instance required plaintiff to suspend operations to reduce the risks of infection by COVID-19 and the contamination of "Covered Property" and further injury that would be occasioned by the spread of COVID-19 at plaintiff's place of business. *Id.* at 49.

18.     On or about March 30, 2020, plaintiff made a claim for coverage under the Policy, seeking coverage caused by COVID-19 and the Closure Orders. In response, defendant denied coverage and requested information that was not reasonably necessary to evaluate plaintiff's claim for coverage. Upon information and belief, defendant has refused to pay its other insureds under the same standard policy for losses and expenses related to COVID-19.

19.     Defendant has caused substantial harm to plaintiff and members of the proposed class by wrongfully refusing coverage under the Policy.

20.     On behalf of itself and the Class, plaintiff seeks to recover damages for breach of contract, as well as declaratory and injunctive relief.

# PARTIES

21.     Plaintiff Protégé Restaurant Partners, LLC is a California limited liability company with its principal place of business in Palo Alto, California. Plaintiff owns and operates Protégé restaurant in Palo Alto.

22.     Defendant Sentinel Insurance Co., Ltd., d/b/a The Hartford, is a Connecticut corporation with its principal place of business in Hartford, Connecticut. Sentinel is a stock insurance company of The Hartford Insurance Group.

# JURISDICTION AND VENUE

23.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the class is a citizen of a state different from defendant, the amount in controversy exceeds $5 million, exclusive of interest and costs, and the proposed class contains more than 100 members.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to plaintiff's claims for relief occurred in this judicial district. The Policy at issue covers plaintiff's restaurant business located in the State of California, and plaintiff purchased the Policy from an insurance broker located in the State of California.

# FACTUAL BACKGROUND

A.  **The Physical Transmission of the Virus Through Air and Surfaces**

25.     According to the CDC, COVID-19 can spread by respiratory droplets when an infected person talks, sneezes, or coughs, and can also be spread through contact with surfaces touched or breathed on by an infected person.  According to several studies, the virus can live on surfaces for several days.

26.     Coronaviruses are not new. The name comes from the crown-like appearance of the array of spikes around the enveloped virion.  Coronaviruses are responsible for approximately 25% of human colds of all age groups. The SARS-CoV-2 disease that spread from southern China in 2002 is a coronavirus. Prior studies have shown that coronaviruses have been detected on surfaces of physical objects located in a wide array of public spaces and businesses, including hospitals, daycare centers, offices, and restaurants. Studies found that SARS-CoVs have retained their

infectivity for up to nine days on surfaces. And studies have shown that coronaviruses can live for up to eight days on produce, such as lettuce, and can be recovered from lettuce with an efficiency of 19.6%.

27.     In an article posted on the National Institute of Health's website on March 24, 2020, the NIH stated that "[v]iruses can live for a time on surfaces outside the human body. According to the CDC, it may be possible to contract the virus responsible for the current outbreak, SARS-CoV-2, by touching a surface or object with the virus on it and then touching your face."

28.     In addition, studies have reported that COVID-19 has been detected in the air. The NIH article reported that a study published in the *New England Journal of Medicine* found that aerosols containing the virus remained highly infectious in the air for at least 3 hours.  In that study, published on March 17, 2020, Researchers led by Dr. Vincent Munster of NIH's National Institute of Allergy and Infectious Diseases studied how long the virus survives in the air and on surfaces. The researchers reported that the COVID-19 virus remained infectious on plastic and stainless steel surfaces for two to three days, and it remained infectious for up to 24 hours on cardboard surfaces. The study found that "Aerosols from infected persons may therefore pose an inhalation threat even at considerable distances and in enclosed spaces…." The NIH, reporting on the study, stated that the "results suggest that people may acquire SARS-CoV-2 through the air and after touching contaminated objects."

29.     This air and surface transmission is made possible in part because COVID-19 transmits through aerosols.  The American Association for the Advance of Science's prestigious magazine *Science* recently published an article by Dr. Kimberly Prather, who found that COVID-19 transmits through aerosols – which are produced by normal breathing – and through surfaces on which the aerosol particles land. She reported

> Respiratory infections occur through the transmission of virus-containing droplets (>5 to 10 μm) and aerosols (≤5 μm) exhaled from infected individuals during breathing, speaking, coughing, and sneezing. Traditional respiratory disease control measures are designed to reduce transmission by droplets produced in the sneezes and coughs of infected individuals. However, a large proportion of the spread of coronavirus disease 2019 (COVID-19) appears to be occurring through airborne transmission of aerosols produced by asymptomatic individuals during breathing

and speaking (1–3). Aerosols can accumulate, remain infectious in indoor air for hours, and be easily inhaled deep into the lungs. [1]

30.    Dr. Prather also found that because it transmits as an aerosol, COVID-19 can physically contaminate surfaces and be transmitted through contact with those infected surfaces.

Respiratory droplets will undergo gravitational settling faster than they evaporate, contaminating surfaces and leading to contact transmission. Smaller aerosols (≤5 µm) will evaporate faster than they can settle, are buoyant, and thus can be affected by air currents, which can transport them over longer distances. Thus, there are two major respiratory virus transmission pathways: contact (direct or indirect between people and with contaminated surfaces) and airborne inhalation.[2]

31.    In an interview with *America* magazine on May 26, Dr. Anthony Fauci, who leads the National Institute of Allergy and Infectious Diseases, referenced aerosol transmission in churches. "When you sing, the amount of droplets and aerosol that come out is really, in some respects, scary," Dr. Fauci said.[3]

32.    Similarly, another scientist, Dr. Lidia Morawska told *Nature* that, "In the minds of scientists working on this, there's absolutely no doubt that the virus spreads in the air. This is a no-brainer."[4]

33.    Other studies have shown that in addition to water droplets, COVID-19 is transmitted through aerosols. A study of hospitals in Wuhan, China, found COVID-19 in aerosols further than 6 feet, and up to 13 feet, from patients with higher concentrations detected in more crowded areas.[5] Those authors found evidence of the virus on floors, trash bins, air vents, and other places. Estimates using an average viral load for COVID-19 indicate that one minute of loud speaking could generate more than 1000 virion-containing aerosols.[6]

---

[1] https://science.sciencemag.org/content/early/2020/05/27/science.abc6197.
[2] *Id.*
[3] https://www.americamagazine.org/faith/2020/05/27/dr-anthony-fauci-catholic-churches-masks-communion-covid-coronavirus.
[4] https://www.nature.com/articles/d41586-020-00974-w.
[5] Y. Liu et al., Nature (2020). doi:10.1038/s41586-020-2271-3pmid:32340022.
[6] V. Stadnytskyi, C. E. Bax, A. Bax, P. Anfinrud, Proc. Natl. Acad. Sci. U.S.A. 202006874 (2020). doi:10.1073/pnas.2006874117pmid:32404416.

34.     Other studies have used invisible fluorescent tracers — decoy germs that glow under black light — to track how germs are spread from surfaces. In one series of experiments, 86 percent of workers were contaminated when spray or powder tracers were put on commonly touched objects in an office. When tracer powder was put on a bathroom faucet and exit doorknob, the glowing residue was found on employees' hands, faces, phones and hair. From a shared cell phone, the tracer spread to desktop surfaces, drinking cups, keyboards, pens and doorknobs. A contaminated copy machine button added a trail of fluorescent finger prints transferred to documents and computer equipment. And just twenty minutes after arriving home from the office, the decoy germs carried by the employee were found on backpacks, keys and purses, and on home doorknobs, light switches, countertops and kitchen appliances.[7]

35.     A recent study of an outbreak from a restaurant in China concluded that the transmission in that case was likely prompted by air-conditioned ventilation.[8]  In that case, from January 26 through February 10, 2020, an outbreak of COVD-19 infected ten persons from three families (families A–C) who had eaten at the same air-conditioned restaurant in Guangzhou, China. The only known source of exposure for the affected persons in families B and C was patient A1 at the restaurant. The families were seated more than a meter apart, and yet 10 people became ill who were at the restaurant that day. The authors concluded that the virus likely spread through the restaurant's air-conditioning system.

36.     A 2014 analysis published in the scientific journal *Clinical Infectious Diseases* investigated an outbreak of a SARS-CoV virus in an apartment complex where the residents were not in close contact.[9] The study found that "airborne spread was the most likely explanation, and the SARS coronavirus could have spread over a distance of 200 meters," or about 600 feet.[10]

---

[7] Kelly A Reynolds, Pamela M Watt, Stephanie A Boone & Charles P Gerba (2005) Occurrence of bacteria and biochemical markers on public surfaces, International Journal of Environmental Health Research, 15:3, 225-234, DOI: 10.1080/09603120500115298.
[8] Lu J, Gu J, Li K, Xu C, Su W, Lai Z, et al. COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020. Emerg Infect Dis. 2020 Jul [date cited]. https://doi.org/10.3201/eid2607.200764.
[9] https://academic.oup.com/cid/article/58/5/683/365793.
[10] *Id.*

COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

37.     The fact that COVID-19 can spread through the aerosols, on surfaces, and through the air has made the ease of transmission of the virus especially alarming. It means the virus can spread to people who are not close to each other, who occupy the same space at different points in time, or who merely breath the same air or touch common surfaces at different periods of time.

**B.  The COVID-19 Closure Orders**

38.     State and local governments have determined that, in light of these dangers of physical transmission, the Closure Orders were required to slow the spread of COVID-19.

39.     On March 11, 2020, the WHO declared COVID-19 a global pandemic. And President Trump announced he would block travelers from continental Europe. On March 12, 2020, an influential scientific study posted on the CDC's website found that surface transmission of the virus was the most likely explanation for an outbreak at a Chinese shopping mall.[11] In that study, the researchers studied an outbreak in January, when seven workers who shared an office in a shopping mall became ill after one of their co-workers returned from Wuhan. Public health officials tracked two dozen more sick people, including several women who had shopped at the mall, as well as their friends. None of them had come into contact with the sick office workers. The researchers concluded that "its findings appear to indicate that low intensity transmission occurred without prolonged close contact in this mall; that is, the virus was spread by indirect transmission." One leading explanation was that the virus was "spread via fomites" (i.e., infected surfaces), such as "elevator buttons or restroom taps." Virus aerosolization was also suspected.

40.     On March 15, 2020, the CDC issued guidance restricting gatherings to less than 50 people. In the guidance, the CDC recognized the danger of spreading the virus through surface transmission, and through the air, advising people to "clean frequently touched surfaces and objects daily," to cover "coughs and sneezes," and to "routinely clean and disinfect surfaces and objects that are frequently touched."

---

[11] https://www.nc.cdc.gov/eid/article/26/6/20-0412_article.

41.    Effective at 12:01 a.m., on March 17, 2020, Santa Clara County issued a stay-at-home order to mitigate the spread of COVID-19 in Santa Clara County on the basis of a confirmed outbreak and person-to-person spread of COVID-19 in the United States, including in California, and Santa Clara County.[12]   The Santa Clara County Order specifically recognized that COVID-19 spreads easily from person to person and may result in serious illness or death. It further expressly recognized that physical surfaces of property located in businesses may be contaminated and a source of transmission, and required cleaning of physical surfaces to reduce transmission.   The Santa Clara County Order was issued in an effort to mitigate and slow the spread of COVID-19 in the community.

42.    Effective March 19, 2020, Governor Gavin Newsom issued an Executive Order and Public Health Order that directed all Californians to stay at home except to go to work at a job deemed to be essential, to shop for essential needs or to seek medical care.[13] The order specifically directed "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors."

43.    As of April 1, 2020, at least forty-four states and local governments across the country issued orders entirely closing restaurants for in-person dining; at least five more allowed only limited on-site service; and one limited gatherings to no more than ten people.[14] By April 15, 2020, at least forty-three states had issued orders closing or severely limiting the operation of non-essential businesses, and at least forty-seven states had issued orders prohibiting restaurants from offering dine-in services, with other states either limiting on-site service or prohibiting gatherings of more than ten people.[15] The purpose of these orders is to try to mitigate and slow the spread of COVID-19.  Every state has now issued emergency declarations to slow the spread of COVID-19.

---

[12] https://www.sccgov.org/sites/covid19/Documents/03-16-20-Health-Officer-Order-to-Shelter-in-Place.pdf.
[13] https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf.
[14] https://web.archive.org/web/20200401202749/https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.
[15] https://web.archive.org/web/20200415130206/https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.

44.     The Closure Orders also explicitly acknowledge that COVID-19 can spread in and damage physical property, including surfaces. For example, the March 16, 2020 Santa Clara County Order required all persons to "regularly" clean "high-touch surfaces," and made this surface-cleaning requirement part of the county-ordered "Social Distancing Requirements." Other Closure Orders in California and across the country, as well as federal government guidance, specifically recognize that COVID-19 endangers property, and can be physically spread by touching infected surfaces and through the air.

45.     COVID-19 and the Closure Orders have forced plaintiff to completely shut down its operations. The restaurant is located in Palo Alto, which is in Santa Clara County, California. There have been 2,675 confirmed cases of COVID-19 in Santa Clara County as of the date of this filing, and 139 confirmed COVID deaths. In the United States, there have been over 1.75 million confirmed cases, and over 104,000 confirmed COVID deaths.

C.  **The Sentinel Business Interruption Policies**

46.     In order to protect itself against unexpected risks like COVID-19, plaintiff purchased the Policy from defendant. The Policy was in effect from January 2020 through January 2021. Plaintiff performed all obligations under the policy and paid all premiums required by the Policy.

47.     Plaintiff is the named insured under the Policy, which remains in force and effect.

48.     Defendant is the insurer of the Policy and policies held by the other members of the Class.

49.     Generally, under business interruption policies like those issued by defendant to plaintiff and Class members, the policies provide coverage for all risks to property, unless specifically excluded.

50.     The Policy form at issue does not exclude or limit coverage for losses from viruses or communicable diseases like COVID-19 in these circumstances. Nor does it contain a pandemic exclusion clause.

51.     The risk of a virus like COVID-19 was foreseen, and foreseeable to, defendant. The Insurance Services Office ("ISO"), an organization that provides policy writing services to

insurers, sent the following statement to state insurance regulators in 2006, in connection with the

submission of an exclusion of loss "due to disease-causing agents such as viruses and bacteria":

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

52.     Plaintiff's Policy contains no such applicable virus exclusion, despite its

availability since 2006. Nor does plaintiff's Policy contain an exclusion for "pandemics,"

"communicable disease," or anything similar.

53.     Moreover, to mitigate further losses, as required by the Policy, plaintiff suspended

operations when the Closure Orders and government officials announced that COVID-19 posed a

risk of causing further physical property damage and loss.

54.     The Policy is composed of several distinct forms. Policyholders can pay for

optional forms and coverages, but the forms themselves are standardized.

55.     The Policy contains several types of additional coverages that provide coverage in

these circumstances. The following additional coverages all appear in the "SPECIAL PROPERTY

COVERAGE FORM," which is a standardized form with form number "Form SS 00 07 07 05."

56.     Defendant agreed to provide coverage from an interruption to business caused by

an order from a **"Civil Authority." (**Exhibit A.) Specifically, defendant agreed to pay for loss of

business income in the following circumstances:

> This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises.

57.     The term "Covered Causes of Loss" is defined to mean "RISKS OF DIRECT

PHYSICAL LOSS," unless that loss is limited or excluded in certain sections of the Policy. *Id.* at

31. Because the Closure Orders directly resulted from the risk of direct physical loss caused by

COVID-19 and have caused plaintiff to have lost the use of its premises for their intended purpose,

plaintiff's losses are covered under the Policy, including under the "Civil Authority" coverage. Access has been restricted to the Covered Property due to the presence and threat of COVID-19 in the immediate surrounding areas and related Closure Orders. Plaintiff has suffered tens of thousands of dollars per month in lost "Business Income" because it has suspended operations of its business due to COVID-19 and the Closure Orders.

58. Defendant is also obligated to pay for actual loss of **"Business Income"** sustained "due to the necessary suspension of your 'operations' during the 'period of restoration.' The suspension must be caused by direct physical loss of or physical damage to property at the 'scheduled premises.'" *Id.* at 39. "Business Income" means net income (net profit or loss before income taxes) that "would have been earned or incurred if no direct physical loss or physical damage had occurred," as well as "Continuing normal operating expenses incurred, including payroll." *Id.* at 39. Coverage lasts during the "period of restoration" – beginning at the time of the "direct physical loss or physical damage" and running through the earlier of the date the property is repaired or resumed at a new permanent location. *Id.* at 53. A "slowdown or cessation" of business activities constitutes a "suspension" under the Policy. *Id.* at 39. Plaintiff has suffered tens of thousands of dollars per month in lost Business Income because of the necessary suspension operations of its business due to the Closure Orders and COVID-19.

59. Defendant also agreed to pay for **"Extra Expense."** *Id.* at 39. Extra Expenses are expenses to avoid or minimize suspension of business whether or not operations are able to continue and to repair or replace property. *Id.* Plaintiff has suffered "Extra Expenses" because it has suspended operations due to COVID-19 and the Closure Orders and has spent money to break-down and clean the property for COVID-19 in order to minimize the suspension of business.

60. Defendant also required plaintiff to "[t]ake all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss" and to "keep a record of your expenses for emergency and temporary repairs, for consideration in the settlement of the claim." This is known as a "**Sue and Labor**" provision. Plaintiff expended expenses to protect and repair the restaurant in response to the Closure Orders and COVID-19, including breaking down the restaurant's equipment and furniture and clean-up costs.

61.     Losses caused by COVID-19 and the related state and local Closure Orders are covered by these provisions of defendant's Policy. Specifically, plaintiff's operations have been suspended, and it has lost revenue and business opportunities because it has been unable to serve its customers in the premises of its business. Losses related to the Closure Orders and COVID-19 are a "Covered Cause of Loss" under the policy, and are covered under each of the foregoing provisions of the policy.

62.     Plaintiff submitted a claim to defendant for coverage under the Policy, but defendant has wrongfully denied plaintiff's claim and requested information not required purportedly to evaluate the claim in order to further its unwarranted plan to effectuate delay and denial of coverage. Sentinel first denied the claim in an email, stating that 'The Hartford has determined there is no coverage for your claim resulting from COVID-19' because a 'covered cause of loss did not cause direct physical loss or damage to your covered property.

63.     The Policy also contains an industry-standard virus exclusion (Form SS 50 57 04 05), but by its terms, this virus exclusion does *not* apply to the SPECIAL PROPERTY COVERAGE FORM that provides the foregoing coverages. Rather, the exclusion explicitly applies only to two other listed forms:

## EXCLUSION – FUNGI, BACTERIA AND VIRUSES

This endorsement modifies insurance provided under the following:

**BUSINESS LIABILITY COVERAGE FORM**
**OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM**

This insurance does not apply to:
1.  Injury or damage arising out of or related to the presence of, suspected presence of, or exposure to:
    a.  Fungi, including but not limited to mold, mildew, and yeast;
    b.  Bacteria;
    c.  Viruses; or
    d.  Dust, spores, odors, particulates or byproducts, including but not limited to mycotoxins and endotoxins, resulting from any of the organisms listed in **a.**, **b.**, or **c.** above;
    from any source whatsoever.
2.  Any loss, cost or expense arising out of the testing for, monitoring of, cleaning up of, removal of, containment of, treatment of, detoxification of, neutralization of, remediation of, disposal of, or any other response to or assessment of, the effects of any of the items in **1.a.**, **b.**, **c.** or **d.** above, from any source whatsoever.
However, this exclusion does not apply to "bodily injury" or "property damage" caused by the ingestion of food.

COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

By including this virus exclusion, and explicitly stating it applies only to forms *other* than the SPECIAL PROPERTY COVERAGE FORM, the Policy makes it clear that this virus exclusion does not apply to the additional coverages alleged above, which give rise to plaintiff's claims.

64. Finally, the Policy also has an "Optional" coverage for "Limited Fungi, Bacteria, or Virus Coverage," which provides additional coverage for certain virus-related losses. *Id.* at 127.

## CLASS ALLEGATIONS

65. Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3) and 23(c)(4), plaintiff brings this action on behalf of itself and all others similarly situated, and seeks to represent the following nationwide classes:

    a. **Nationwide Declaratory and California subclass and Injunctive Relief Class.** All policyowners subject to a Closure Order that are insured by one of the defendant's policies which contains **Business Income, Civil Authority, Extra Expense, or Sue and Labor** coverage on terms similar to the plaintiff's Policy ("collectively, the Policies") which were in effect at any time during the COVID-19 pandemic.

    b. **Nationwide Breach of Contract Class.** All policyholders of defendant who made a claim and were denied coverage under one of defendant's Policies due to COVID-19.

    c. **Nationwide Virus Endorsement Class**. All policyholders who purchased one of defendant's Policies which contains **Limited Fungi, Bacteria or Virus Coverage** on terms similar to the plaintiff's policy, which were in effect at any time during the COVID-19 pandemic and were denied coverage due to COVID-19.

    d. **California Subclass.** All policyholders who purchased one of defendant's Policies in California and were denied coverage due to COVID-19.

Excluded from the Classes are defendant; any of the officers, directors, or employees of the defendant; and the legal representatives, successors, and assigns of the defendant.

66. Plaintiff's Classes satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action under Rule 23, as alleged more fully herein.

67.  **Numerosity**. COVID-19 has impacted thousands of businesses across the country and defendant is a nationwide insurer which, on information and belief, issued thousands of Policies with the relevant provisions both in California and nationwide. Consequently, members of each Class are so numerous that individual joinder of all Class members is impracticable. Class members and California Subclass members may be informed of the pendency of this class action through recognized, Court-approved notice dissemination methods, including direct mail or other means based on defendant's records of its policyholders.

68.  **Commonality**. There are predominant questions of fact and law common to the Classes. These include, without limitation, the following:

    a.  Do the Policies cover losses resulting from the Closure Orders and COVID-19?

    b.  Do the Policies cover losses resulting from state and local Closure Orders requiring the suspension or reduction in business?

    c.  Has defendant wrongfully denied claims for losses resulting from COVID-19 and/or the Closure Orders?

    d.  Does the **Business Income** coverage of the Policies cover losses due to COVID-19 and the Closure Orders?

    e.  Does the **Civil Authority** coverage of the Policies cover losses due to COVID-19 and the Closure Orders issued by state and local governments?

    f.  Does the **Extra Expense** coverage of the Policies cover losses due to COVID-19 or the Closure Orders?

    g.  Does the **Sue and Labor** coverage of the Policies cover losses due to COVID-19 or the Closure Orders?

    h.  Does the **Virus Endorsement** coverage of the Policies cover losses due to COVID-19 or the Closure Orders?

    i.  Has defendant breached its Policies by refusing to cover COVID-19 related losses?

    j.  Are Class members entitled to reasonable attorneys' fees and expenses?

69.    **Predominance.** The common questions predominate over any individual issues in the action.  Thousands of business are impacted by defendant's denial of coverage for COVID-19 losses and their claims arise from a common factual predicate, which is the nationwide shutdown and suspension of activities due to the virus and Closure Orders. On information and belief, defendant has denied these COVID-19 claims in form letters that give substantially the same, classwide reasons for the denial of coverage. The Policies are written on form contracts that are common to the Classes, and the breach will be common to the Classes.

70.    **Typicality.** Plaintiff's claims are typical of those of the Classes because plaintiff and other Class members have the same or similar policy provisions, their losses stem from COVID-19 and the Closure orders, they are similarly situated with respect to defendant's reasons for denial of coverage, and their claims arise from the same legal theories.

71.    **Superiority**. A class action is the superior method for the fair and efficient adjudication of this controversy. Defendant has acted on grounds applicable to the Classes and California Subclass. Individualized litigation would create a risk of inconsistent and varying adjudications, would establish incompatible standards of conduct for defendant, and substantially impairs or impedes the ability of Class members to protect their interests, given that individual claims may too expensive to litigate.

72.    **Declaratory Relief – Rule 23(b)(2)**.  Defendant has acted or refused to act on grounds applicable to the Classes and California Subclass, making injunctive and declaratory relief as described below appropriate. Specifically, defendant has denied COVID-19 claims on similar grounds, under similar Policies, and in similar factual circumstances.

73.    **Adequacy**. Plaintiff is an adequate representative of the Classes and California Subclass because it is a member of the Classes and its interests do not conflict with the interests of those it seeks to represent. Plaintiff's counsel, who have extensive experience prosecuting complex class litigation, along with plaintiff will fairly and adequately protect the interests of the Classes.

74.    **Issue Class and Modification of Class Definitions and Creation of Subclasses**. In the alternative, plaintiff reserves the right to seek certification of one or more common issues

pursuant to Rule 23(c)(4), and to modify the class definition, including by seeking certification of subclasses for policyholders with each of the following Policy provisions: **Business Income, Civil Authority, Extra Expense, Sue and Labor, and Virus Endorsement,** or other subclasses as may be appropriate or necessary.

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT – BUSINESS INCOME

## (On behalf of Nationwide Breach of Contract Class and California Subclass)

75.     The preceding paragraphs are incorporated by reference as if fully alleged herein.

76.     Plaintiff and the Class purchased property coverage policies from defendant.

77.     Plaintiff and the Class substantially performed their obligations under the Policies including giving defendant notice of the claim. Alternatively, defendant has waived any conditions, terms or defenses to coverage.

78.     The Policies are enforceable contracts between the defendant and plaintiff and Class members.

79.     Plaintiff and the Class have sustained a loss under the Business Income coverage in the Policies due to the COVID-19 virus and Closure Orders.

80.     Defendant has wrongfully refused to pay the claim for Business Income, and instead has requested information not necessary to determine coverage.

81.     Defendant has denied claims for Business Income related to COVID-19 on a uniform and classwide basis, in breach of the Policies.

82.     As a direct and proximate result of defendant's breaches, plaintiff and the members of the Class have sustained damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

## DECLARATORY AND INJUNCTIVE RELIEF – BUSINESS INCOME
### (On behalf of Nationwide Declaratory Judgment and Injunctive Relief Class and California Subclass)

83.     The preceding paragraphs are incorporated by reference as if fully alleged herein.

84.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

85.     An actual controversy has arisen and now exists between plaintiff and the Class, on the one hand, and defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies. On or about March 30, 2020, plaintiff requested coverage for COVID-19-related losses through its agent. Defendant responded with a letter denying coverage and seeking information that is not reasonably necessary to evaluate plaintiff's claim. Defendant is in breach of its obligations by refusing to provide coverage despite having sufficient information to evaluate and pay the claim.

86.     Moreover, upon information and belief, defendant has denied its insureds' claims related to Closure Orders and COVID-19 on a uniform and classwide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim for coverage.

87.     Plaintiff seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the conduct of defendant alleged above to be unlawful and in material breach of the Policies so that future controversies may be avoided. Specially, plaintiff seeks a declaration that:

    a.  The losses incurred in connection with COVID-19 and the Closure Orders are insured losses under plaintiff's and class members' Policies; and

    b.  Sentinel is obligated to pay policyowners the full amount of the Business Income losses incurred and to be incurred in connection with COVID-19 and the Closure Orders during the period of restoration and the necessary suspension of their business operations.

88.     Plaintiff further seeks an injunction enjoining defendant (1) from continuing to engage in breaching its coverage obligations under the Business Income Coverage Extension; and (2) ordering defendant to comply with the terms of the Policies regarding to coverage decisions.

## THIRD CLAIM FOR RELIEF

### DECLARATORY AND INJUNCTIVE RELIEF – CIVIL AUTHORITY
**(On behalf of Nationwide Declaratory Judgment and
Injunctive Relief Class and California Subclass)**

89.     The preceding paragraphs are incorporated by reference as if fully alleged herein.

90.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

91.     An actual controversy has arisen and now exists between plaintiff and the Class, on the one hand, and defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies. On or about March 30, 2020, plaintiff requested coverage for COVID-19-related losses through its agent. Defendant responded with a letter wrongfully denying coverage and seeking information that is not reasonably necessary to evaluate plaintiff's claim. Defendant is in breach of its obligations under the Policy by refusing to provide coverage despite having sufficient information to evaluate and pay plaintiff's claims.

92.     Moreover, upon information and belief, defendant has denied claims related to Closure Orders and COVID-19 on a uniform and classwide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim for coverage.

93.     Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the conduct of defendant alleged above to be unlawful and in material breach of the Policies so that future controversies may be avoided. Specially, plaintiff seeks a declaration that:

     a. The losses incurred in connection with COVID-19 and the Closure Orders are insured losses under plaintiff's and class members' Policies; and

     b. Sentinel is obligated to pay policyowners the full amount of the Civil Authority losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary suspension of their businesses.

94.     Plaintiff further seeks an injunction enjoining defendant (1) from continuing to engage in breaching its coverage obligations under the Civil Authority Coverage Extension; and (2) ordering defendant to comply with the terms of the Policies regarding to coverage decisions.

**FOURTH CLAIM FOR RELIEF**

**BREACH OF CONTRACT – CIVIL AUTHORITY**

**(On behalf of Nationwide Breach of Contract Class and California Subclass)**

95.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

96.    Plaintiff and the Class purchased property coverage policies from defendant.

97.    Plaintiff and the Class substantially performed their obligations under the Policies including giving defendant notice of the claim. Alternatively, defendant has waived any conditions, terms or defenses to coverage.

98.    The Policies are enforceable contracts between the defendant and plaintiff and Class members.

99.    Plaintiff and the Class have sustained a loss under the Civil Authority Coverage in the Policies due to the COVID-19 virus and Closure Orders.

100.    Defendant has refused to pay the claim for Civil Authority coverage, and instead has requested information not necessary to determine coverage.

101.    Defendant has denied claims for Civil Authority related to COVID-19 on a uniform and classwide basis, in breach of the Policies.

102.    As a direct and proximate result of defendant's breaches, plaintiff and the Class have sustained damages in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF –**
**EXTRA EXPENSE**
**(On behalf of Nationwide Declaratory Judgment and**
**Injunctive Relief Class and California Subclass)**

103.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

104.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

105.    An actual controversy has arisen and now exists between plaintiff and the Class, on the one hand, and defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies. On or about March 30, 2020, plaintiff requested coverage for COVID-19-related losses through its agent. Defendant responded with a letter denying coverage and

seeking information that is not reasonably necessary to evaluate its claim. Defendant is in breach of its obligations by refusing to provide coverage despite having sufficient information to evaluate and pay the claim.

106.    Moreover, upon information and belief, defendant has denied claims related to Closure Orders and COVID-19 on a uniform and classwide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim for coverage.

107.    Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the conduct of defendant alleged above to be in breach of the Policies so that future controversies may be avoided. Specially, plaintiff seeks a declaration that:

    a.  The losses incurred in connection with COVID-19 and the Closure Orders are insured losses under plaintiff's and class members' Policies; and

    b.  Sentinel is obligated to pay policyowners the full amount of the Extra Expense losses incurred and to be incurred in connection with COVID-19 and the Closure Orders during the period of restoration and the necessary suspension of their businesses.

108.    Plaintiff further seeks an injunction enjoining defendant (1) from continuing to engage in breaching its coverage obligations under the Extra Expense Coverage Extension; and (2) ordering defendant to comply with the terms of the Policies regarding to coverage decisions.

## SIXTH CLAIM FOR RELIEF

## BREACH OF CONTRACT – EXTRA EXPENSE

### (On behalf of Nationwide Breach of Contract Class and California Subclass)

109.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

110.    Plaintiff and the Class purchased property coverage policies from defendant.

111.    Plaintiff and the Class substantially performed their obligations under the Policies including giving defendant notice of the claim. Alternatively, defendant has waived any conditions, terms or defenses to coverage.

112.    The Policies are enforceable contracts between the defendant and plaintiff and Class members.

113.    Plaintiff and the Class have sustained a loss under the Extra Expense Coverage in the Policies due to the COVID-19 virus and Closure Orders.

114.    Defendant has refused to pay the claim for Extra Expense, and instead has requested information not necessary to determine coverage.

115.    Defendant has denied claims for Extra Expense related to COVID-19 on a uniform and classwide basis, in breach of the Policies.

116.    As a direct and proximate result of defendant's breaches, plaintiff and the Class have sustained damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF – SUE AND LABOR
**(On behalf of Nationwide Declaratory Judgment and Injunctive Class and California Subclass)**

117.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

118.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

119.    An actual controversy has arisen and now exists between plaintiff and the Class, on the one hand, and defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies. On or about March 30, 2020, plaintiff requested coverage for COVID-19-related losses through its agent. Defendant responded with a letter denying coverage and seeking information that is not reasonably necessary to evaluate its claim. Defendant is in breach of its obligations by refusing to provide coverage despite having sufficient information to evaluate and pay the claim.

120.    Moreover, upon information and belief, defendant has denied claims related to Closure Orders and COVID-19 on a uniform and classwide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim for coverage.

121.    Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the aforementioned conduct of defendant unlawful and in material breach of the Policies so that future controversies may be avoided. Specially, plaintiff seeks a declaration that:

a.    The losses incurred in connection with COVID-19 and the Closure Orders are insured losses under plaintiff's and class members' policies; and

b.    Sentinel is obligated to pay policyowners for the full amount of the Sue and Labor losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary suspension of their businesses.

122.    Plaintiff further seeks an injunction enjoining defendant (1) from continuing to engage in breaching its coverage obligations under the Sue and Labor Coverage Extension; and (2) ordering defendant to comply with the terms of the Policies regarding to coverage decisions.

## EIGHTH CLAIM FOR RELIEF

## BREACH OF CONTRACT – SUE AND LABOR

### (On behalf of Nationwide Breach Class and California Subclass)

123.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

124.    Plaintiff and the Class purchased property coverage policies from defendant.

125.    Plaintiff and the Class substantially performed their obligations under the Policies including giving defendant notice of the claim. Alternatively, defendant has waived any conditions, terms or defenses to coverage.

126.    The Policies are enforceable contracts between the defendant and plaintiff and Class members.

127.    Plaintiff and the Class have sustained a loss under the Sue and Labor Coverage in the Policies due to the COVID-19 virus and associated state and local Closure Orders.

128.    Defendant has refused to pay the claim for Sue and Labor, and instead has requested information not necessary to determine coverage.

129.    Defendant has denied claims for Sue and Labor related to COVID-19 on a uniform and classwide basis, in breach of the policies.

130.    As a direct and proximate result of defendant's breaches, plaintiff and the Class have sustained damages in an amount to be determined at trial.

**NINTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF –**
**VIRUS ENDORSEMENT**
**(On behalf of Nationwide Declaratory Judgment and**
**Injunctive Class and California Subclass)**

131.    The preceding paragraphs are incorporated by reference as if fully alleged herein, and this claim is pled in the alternative.

132.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

133.    An actual controversy has arisen and now exists between plaintiff and the Class, on the one hand, and defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies. On or about March 30, 2020, plaintiff requested coverage for COVID-19-related losses through its agent. Defendant responded with a letter wrongfully denying coverage and seeking information that is not reasonably necessary to evaluate its claim. Defendant is in breach of its obligations by refusing to provide coverage despite having sufficient information to evaluate and pay the claim.

134.    Moreover, upon information and belief, defendant has denied claims related to Closure Orders and COVID-19 on a uniform and classwide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim for coverage.

135.    Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the aforementioned conduct of defendant unlawful and in material breach of the Policies so that future controversies may be avoided. Specially, plaintiff seeks a declaration that:

    a.    The losses incurred in connection with COVID-19 and the Closure Orders are insured losses under plaintiff's and class members' Policies; and

    b.    Sentinel is obligated to pay policyowners for the full amount of the Virus Endorsement losses incurred and to be incurred in connection with the Closure

Orders during the period of restoration and the necessary suspension of their businesses.

136. Plaintiff further seeks an injunction enjoining defendant (1) from continuing to engage in breaching its coverage obligations under the Virus Endorsement Coverage Extension; and (2) ordering defendant to comply with the terms of the Policies regarding to coverage decisions.

**TENTH CLAIM FOR RELIEF**

**BREACH OF CONTRACT – VIRUS ENDORSEMENT**

**(On behalf of Nationwide Breach Class and California Subclass)**

137. The preceding paragraphs are incorporated by reference as if fully alleged herein, and this claim is pled in the alternative.

138. Plaintiff and the Class purchased property coverage policies from defendant.

139. Plaintiff and the Class substantially performed their obligations under the Policies including giving defendant notice of the claim. Alternatively, defendant has waived any conditions, terms or defenses to coverage.

140. The Policies are enforceable contracts between the defendant and plaintiff and Class members.

141. Plaintiff and the Class have sustained a loss under the Virus Endorsement Coverage in the Policies due to the COVID-19 virus and Closure Orders.

142. Defendant has refused to pay the claim for Virus Endorsement, and instead has requested information not necessary to determine coverage.

143. Defendant has denied claims for Virus Endorsement related to COVID-19 on a uniform and classwide basis, in breach of the Policies.

144. As a direct and proximate result of defendant's breaches, plaintiff and the Class have sustained damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, individually and on behalf of all others similarly situated, requests relief and judgment against defendant as follows:

1.     That the Court enter an order certifying the classes, appointing plaintiff as a representative of the classes, appointing plaintiff's counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class;

2.     For a judgment against defendant for the claims for relief alleged against it;

3.     For damages in an amount to be proven at trial;

4.     For a declaration that defendant's conduct as alleged herein is unlawful and in material breach of the Policies;

5.     For appropriate injunctive relief, enjoining defendant from continuing to breach of the Policies;

6.     For pre-judgment and post-judgment interest at the maximum rate permitted by law;

7.     For plaintiff's attorney's fees;

8.     For plaintiff's costs incurred; and for such other relief as the Court deems just and proper.

Dated:  June 2, 2020                 Respectfully submitted,

MARC M. SELTZER
STEVEN SKLAVER
SETH ARD
SUSMAN GODFREY L.L.P.


By: */s/ Mark M. Seltzer*
             Marc M. Seltzer

*Attorneys for Plaintiff*

1

## <u>DEMAND FOR JURY TRIAL</u>

2

3        Plaintiff hereby demands a trial by jury of any issue triable by right of a jury pursuant to

Rule 38 of the Federal Rules of Civil Procedure.

4

5    Dated:  June 2, 2020                    Respectfully submitted,

6                                           MARC M. SELTZER
                                            STEVEN SKLAVER
7                                           SETH ARD
                                            SUSMAN GODFREY L.L.P.
8

9
                                           By: */s/ Mark M. Seltzer*
10                                               Marc M. Seltzer

11                                         *Attorneys for Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28